FILED

2007 Apr-16  PM 03:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | | |
|---|---|---|
| **AMERICAN SEAFOODS GROUP LLC,** | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | **Case No.:  7:07-CV-620-RDP** |
| **v.** | } | |
| | } | |
| **DONNIE WEDGWORTH,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

## I.     Introduction

Currently pending before the court is Plaintiff's Emergency Motion for a Temporary Restraining Order and/or a Preliminary Injunction.  (Doc. # 2).  The court ordered briefing as to the motion for preliminary injunction.  The court held an evidentiary hearing on April 10, 2007, and the parties have fully briefed the motion.   Accordingly, the motion is ripe for decision.  By agreement of the parties during the hearing, the court found that Plaintiff's Emergency Motion for a Temporary Restraining Order was moot.  (Transcript of Hearing on Preliminary Injunction, April 10, 2007, ("Tr.") 44).   Furthermore, the parties have agreed to submit an order to the court prohibiting Defendant from soliciting Plaintiff's employees for employment, which removes this issue from Plaintiff's motion for a preliminary injunction.  For the reasons discussed below, the court finds that the remaining parts of Plaintiff's Motion for Preliminary Injunction are due to be denied as Plaintiff has failed to establish a substantial likelihood of success of its suit on the merits.

## II.   Statement of Facts[1]

American Seafoods Group LLC ("American Seafoods" or "Plaintiff") is a Delaware limited liability company with its principal place of business in Seattle, Washington.  American Seafoods harvests and processes a variety of fish species and markets its products to a diverse group of customers in North America, Asia, and Europe.  American Seafoods is the parent company of Southern Pride Catfish LLC ("Southern Pride").  Southern Pride processes catfish in Greensboro, Alabama, and it is a division of American Seafoods.

Defendant Donnie Wedgworth ("Wedgworth" or "Defendant") is a resident of the State of Alabama and is over the age of nineteen years old.  From 1979 until December 16, 2002, Wedgworth worked in the catfish industry as a buyer of live catfish, first as an independent broker and then as a buyer for Southern Pride Catfish Company, Inc ("SPCC").  Wedgworth was the Director of Live and Harvest Operations at SPCC.  On May 9, 2001, Wedgworth entered into a Confidentiality and Non-Disclosure Agreement ("First Agreement") with Southern Pride's predecessor SPCC.  (Doc. # 2 Ex. B).

On December 16, 2002, American Seafoods purchased the assets of SPCC.  On that same date, Wedgworth entered into a second agreement entitled Alternative Employment Agreement ("Second Agreement") with American Seafoods and Southern Pride, which superceded the First Agreement.  (Doc. # 2 Ex. C; Tr. 57–58).  Upon signing this agreement, Wedgworth became employed as the Director of Live and Harvest Operations for Southern Pride, a division of American Seafoods.  As Director of Live and Harvest Operations, Wedgworth's responsibility was to obtain

---

[1]Facts are taken from the Parties' Stipulated Facts (Doc. # 10) unless otherwise noted.

Southern Pride's supply from the catfish farms.  The Second Agreement set forth confidentiality provisions as follows:

> Executive [Wedgworth] further acknowledges that in performing his duties hereunder, he will have access to proprietary and confidential information and to trade secrets of Employer and its subsidiaries and affiliates.  Any confidential and/or proprietary information of Employer or any of its subsidiaries or affiliates shall not be used by Executive or disclosed or made available by Executive to any person except (I) as required in the course of Executive's employment or (ii) when required to do so by a court of law, by any governmental agency having supervisory authority over the business of Employer or by any administrative or legislative body (including committee thereof) with apparent jurisdiction to order him to divulge, disclose or make accessible such information, it being understood that Executive will promptly notify Employer of such requirement so that Employer may seek to obtain a protective order.  Upon expiration or earlier termination of the term of Executive's employment, Executive shall return to Employer all such information that exists in written or other physical form (any all copies thereof) under Executive's control. Executive agrees to execute, acknowledge and deliver to Employer at Employer's request a confidentiality agreement containing provisions inclusive of the foregoing provisions of this paragraph 10(b).

(Doc. # 2 Ex. C ¶ 10(b)).  Also in the Second Agreement, Wedgworth agreed to the following non-competition and non-solicitation provisions:

> (b)    Non-Compete.  Executive agrees that during the Employment Term, and the Severance Pay Period (if applicable), and the 12-month period thereafter (except if Executive's employment is terminated for Cause or Executive terminates his employment without Good Reason, in which case such 12-month period shall be extended to a 24-month period), he shall not, directly or indirectly, engage in, or participate as an investor in, an officer, employee, director or agent of, or consultant for, any entity engaging in any line of business competitive with that of Employer or any of its subsidiaries or affiliates, or any line of business which Employer or any of its subsidiaries or affiliates is contemplating . . . .

> . . .

> (c)    Nonsolicitation of Employees.  Executive agrees that during the Employment Term and the Severance Pay Period (if applicable), and the 36-month period thereafter (the "Nonsolicitation Period"), he will not, directly or indirectly, (I) employ, or be a Participant in any entity that employs, any person employed by Employer or any of its subsidiaries or affiliates in any supervisory capacity during the

3

preceding 365 days or (<u>ii</u>) in any way induce or attempt to induce any person to leave the employment of Employer or any of its subsidiaries or affiliates.

(d)    <u>Non Solicitation of Customers</u>.   Executive agrees that during the Non-Solicitation Period, he will not directly or indirectly, solicit or do business with, or be a Participant in any entity that solicits or does business with, any customer of Employer or any of its subsidiaries or affiliates, nor shall Executive in any way induce or attempt to induce any customer of Employer or any of its subsidiaries or affiliates to do business with any person or entity other than Employer or its subsidiaries or affiliates . . . .   Notwithstanding the foregoing, after the expiration of the noncompetition period set forth in Paragraph 11(b), Executive may participate as an investor in, an officer, employee, director or agent of or consultant for an entity that does business with one or more customers of Employer in competition with Employer or any of its subsidiaries or affiliates so long as Executive has no contact with such customer and has no direct or indirect involvement in the solicitation of competitive business from any such customer.

(Doc. # 2 Ex. C ¶¶ 11(b), (c), & (d)).  Furthermore, pursuant to Paragraph 22 of the Second Agreement,  Wedgworth's obligations under the provisions of Paragraphs 10, 11, and 12 (the non-disclosure, non-competition, non-solicitation, and non-disparagement provisions) "survive the termination or expiration of [the] Agreement."  (Doc. # 2 Ex. C ¶ 22).

On July 6, 2005, Southern Pride provided notice to Wedgworth that it intended to terminate the Second Agreement effective December 16, 2005.  (Doc. # 2 Ex. D).  Following the expiration of the employment term under the Second Agreement, Mr. Wedgworth remained employed as the Southern Pride Director of Live & Harvest Operations and was an at-will, salaried employee, subject to the surviving provisions in the Second Agreement that, pursuant to their terms, continued to govern his employment and post-employment conduct.  (Tr. 20).

On March 16, 2007, Wedgworth resigned from American Seafoods and provided notice that same day.  (Doc. # 2 Ex. E).  Following Wedgworth's resignation, David Bleth ("Bleth") asked

4

Wedgworth to sign an "Employment Separation Agreement," but Wedgworth refused to sign the proposed agreement.  (Doc. # 7 Ex. A).

Since the time of his voluntary resignation, Wedgworth has been employed by Country Select. Country Select is a competitor of Southern Pride in that they sell to similar customers and buy from similar suppliers.  Country Select (a/k/a Consolidated Catfish Companies) sells to and calls on some customers of Southern Pride.  During his employment with Country Select, Wedgworth has solicited and continues to solicit some of Southern Pride's suppliers, including Hollingsworth Brothers farm, Drury Catfish farm, BGH farm, North River, and Double K.  Additionally, Wedgworth has sought to buy product from Bubba Drury's catfish farm, a Southern Pride supplier, and later purchased fish from Drury's on behalf of Country Select.  Wedgworth's business activities for Country Select are limited to seeking to purchase fish from suppliers.  He does not try to sell to any customers.

Plaintiff seeks a preliminary injunction to enforce the terms of its non-compete, non-disclosure, non-disparagement, and non-solicitation agreements with Defendant.  Specifically, Plaintiff asks this court to prohibit Defendant from: (1) working with or on behalf of any Southern Pride or American Seafoods' competitor in any capacity; (2) calling upon and soliciting business in any manner from any Southern Pride or American Seafoods supplier; (3) soliciting or contacting any of American Seafoods' or Southern Pride's past, current, or potential customers; (4) soliciting for employment in any manner any American Seafoods or Southern Pride employees; (5) making any negative or disparaging remarks about American Seafoods or Southern Pride; (6) soliciting any American Seafoods or Southern Pride customers or vendors to breach a contract of any type with American Seafoods or Southern Pride; (7) publishing, disclosing, or using for any purpose any

5

information regarding Southern Pride's suppliers, customers, pricing, or other confidential information Defendant learned by virtue of his prior employment with Southern Pride; and, (8) requiring Defendant's employer to assist in enforcing the non-compete, non-solicitation, and non-disclosure agreements, and prohibiting Defendant's employer from assisting him in breaching his employment agreements.  (Doc. # 2 at 28).

During the evidentiary hearing, the parties agreed that there is no evidence that Wedgworth has solicited or has contact with any of American Seafoods' or Southern Pride's past, current, or potential customers.  (Tr. 76–77).  Accordingly, there is no basis for this court to determine that Defendant has solicited customers of Plaintiff, and enjoin that type of conduct.  Likewise, Plaintiff did not present any evidence or argument that suggests Wedgworth's new employer was involved in assisting him to breach his employment agreement.  Therefore, aside from the fact that this court would, in any event, decline to issue a third-party injunction in this case against a party not before the court that Plaintiff has not sought to join as a defendant, the court also finds that by failing to present argument on this issue, Plaintiff has abandoned any claim for relief on this point.  *See McMaster v. United States*, 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment").  Finally, as noted above, as to Item (4), the parties have agreed to jointly draft and submit an order to the court prohibiting Defendant's solicitation of Plaintiff's employees.

6

The remaining items—(1), (2), (5), (6), and (7)—ask for a preliminary injunction based upon Defendant's alleged breach of contractual covenants not to compete, solicit, disparage, and disclose proprietary or confidential information.  Although each claim is ultimately for Defendant's alleged breach of a specific contractual provision, the court will analyze Items (1), (2) and (6) as alleging breaches of the non-compete and/or non-solicitation provisions in Paragraphs 11(b) & (d) of the Second Agreement, Item (5) as it relates to Defendant's alleged breach of the non-disparagement provision in Paragraph 12 of the Second Agreement, and Item (7) in light of Defendant's obligations under Paragraph 10(b)'s non-disclosure provision of the Second Agreement.

## III.  Standard of Review

A district court may grant a preliminary injunction if the movant, here Plaintiff, can show the following: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.  *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).

## IV.  Discussion

As stated above, Plaintiffs ask this court to issue a preliminary injunction based upon Defendant's alleged breach of a contractual covenant not to compete, solicit, and disclose.  "A substantial likelihood of success on the merits is one of the conditions [Plaintiff] must satisfy in order to justify a preliminary injunction.  A preliminary injunction is a 'drastic' remedy . . . ." *Crochet v. Housing Authority of City of Tampa*, 37 F.3d 607, 610 (11th Cir. 1994) (internal citations omitted).  Because the court finds Plaintiff has not shown that there is a substantial likelihood of

success on the merits of its claim, it will not consider the other three factors—irreparable injury to Plaintiff, undue burden of the injunction on Defendant, and whether the injunction would be in the public interest.

There is no question that Plaintiff previously entered into an employment agreement with Defendant and contends Defendant has violated the terms of the agreement.  It is equally clear that Plaintiff will seek damages for these claims under a breach of contract theory.  "The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages."[2]  *Reynolds Metals Co. v. Hill*, 825 So. 2d 100, 105–106 (Ala. 2002).  However, a non-compete agreement between an employee and employer is a highly-specialized type of contract implicating a very unique body of law.

The general rule under Alabama law is that non-compete clauses are void: "Every contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section is to that extent void."  ALA. CODE § 8–1–1(a) (1975).  However, § 8–1–1(b) provides an exception to that rule and allows the enforcement of a non-competition agreement entered into between an employer and an employee:

> One who sells the good will of a business may agree with the buyer and one who is employed as an agent, servant or employee may agree with his employer to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a specified county, city, or part thereof so long as the buyer, or any person deriving title to the good will from him, or employer carries on a like business therein.

---

[2]At the evidentiary hearing, the parties stipulated to some amount of damages, even if nominal, so as to satisfy the court as to the fourth prong of the *Reynolds* test.  (Tr. 1–2).

ALA. CODE § 8–1–1(b) (1975).  Thus, as it undertakes the analysis below, the court remains mindful

of Alabama's public policy that strongly disfavors covenants not to compete.

Complicating the discussion further is the fact that non-solicitation agreements, such as those

found in Paragraphs 11(c)–(d) of the Second Agreement, are legally distinct from non-compete

provisions.  "[T]he Alabama Supreme Court held that an agreement which did not prohibit the

defendant, an insurance agent, from doing business, but merely from soliciting former policyholders,

was only a partial restraint of trade and, therefore, not violative of § 8–1–1. [*Hoppe v. Preferred Risk*

*Mut. Ins. Co.*,] 470 So.2d [1161,] 1164 [(Ala. 1985)]; *see also Famex, Inc. v. Century Ins. Services,*

*Inc.*, 425 So.2d 1053 (Ala. 1982) (holding that non-solicitation clause does not violate § 8-1-1 of

Alabama Code (1994))."  *Digitel Corp. v. Deltacom, Inc.*, 953 F. Supp. 1486, 1495 (M.D. Ala.

1996).  "To determine, however, whether the non-solicitation agreement should be enforced, the

court must examine 'the facts of the particular case' and make a determination 'as to whether the

restriction upon one person is greater than necessary for the reasonable protection of a substantial

interest of the other party.'  *Affiliated Paper Companies, Inc. v. Hughes*, 667 F. Supp. 1436, 1447

(N.D. Ala. 1987)."  *Digitel Corp.*, 953 F. Supp. at 1495.

Fortunately, in this case, the court need not scrutinize the underlying policy concerns

surrounding covenants not to compete and solicit, nor make any potentially arbitrary and premature

decisions about a restriction's reasonableness or its possible relation to the employer's "protectable

interest."  *See, e.g.*, *Picker Intern, Inc. v. Parten*, 935 F.2d 257, 261–62 (11th Cir. 1991) ("In order

to be found reasonable under Alabama law, a covenant not to compete must meet four criteria: '(1)

the employer has a protectable interest; (2) the restriction is reasonably related to that interest; (3)

the restriction is reasonable in time and place; [and] (4) the restriction imposes no undue hardship.'"

(citing *DeVoe v. Cheatham*, 413 So.2d 1141, 1142 (Ala. 1982)).  This is because Plaintiff cannot show that it is substantially likely to succeed in proving that Defendant has breached the terms of the Second Agreement on its face, including the non-compete, non-solicitation, non-disparagement, and non-disclosure provisions.  The court will examine each of Plaintiff's claims in turn.

### Plaintiff's Claims Regarding the Non-Compete Provision

_____As set out above, the non-compete provision contained in the Second Agreement states as follows:

> (b)    Non-Compete.  Executive agrees that during the Employment Term, and the Severance Pay Period (if applicable), and the 12-month period thereafter (except if Executive's employment is terminated for Cause or Executive terminates his employment without Good Reason, in which case such 12-month period shall be extended to a 24-month period), he shall not, directly or indirectly, engage in, or participate as an investor in, an officer, employee, director or agent of, or consultant for, any entity engaging in any line of business competitive with that of Employer or any of its subsidiaries or affiliates, or any line of business which Employer or any of its subsidiaries or affiliates is contemplating . . . .

(Doc. # 2 Ex. C ¶ 11(b)).  It is undisputed that: (1) the "Employment Term," which is defined in paragraph one of the Second Agreement, was from December 16, 2002 to December 16, 2005; (2) Plaintiff terminated the Second Agreement, by its terms, on December 16, 2005; (3) Paragraph 22 of the Second Agreement provides that Paragraph 11(b) survives the termination of the agreement; (4) Wedgworth remained employed as an at-will employee subject to the surviving terms of the Second Agreement from December 16, 2005 to March 16, 2007; and (5) on March 16, 2007, Wedgworth voluntarily resigned his position with Plaintiff.  (Doc. # 10).  With these undisputed facts in mind, the court undertakes to answer the crucial question: which period—*i.e.*, the twelve-month or twenty-four month extension—applies to Wedgworth?  Plaintiff argues that since Wedgworth ultimately resigned for health-related reasons (Tr. 16–17), he did so without "Good

Reason," as defined by Paragraph 8(a) of the Second Agreement.  Based upon this assertion, Plaintiff argues that the applicable extension period is  twenty-four months, and this prevents Wedgworth from competing with Plaintiff until December 16, 2008.  Defendant argues that it must be the twelve-month period that applies here (which means the provisions of non-compete clause ended December 16, 2006), because any event which may have extended the non-compete's prohibitions to twenty-four months occurred outside of the initial twelve-month extension.  Thus, under Defendant's theory, the non-compete clause had already ended by its own terms when Wedgworth voluntarily resigned, making the issue of whether he resigned without "Good Reason" irrelevant to the present case.  For the reasons stated below, the court agrees with Defendant and finds that the non-compete provision of the Second Agreement expired by its terms on December 16, 2006.

"It is well settled under Alabama law that the words of a contract are to be given their ordinary meaning and that the intention of the parties is to be derived, if possible, from the provisions of the contract itself." *Universal Underwriters Ins. Co. v. Thompson*, 776 So. 2d 81, 84 (Ala. 2000) (citations omitted).  "Where a contract, by its terms, is plain and free from ambiguity, there is no room for construction and the contract must be enforced as written." *Id.* (citations omitted).  Applying these rules to the present case, the court concludes that the non-compete provision extended only to the twelve-month period after the end of the "Employment Term," and, therefore, that provision expired on December 16, 2006.  Clearly, the "Employment Term" ended December 16, 2005, and *nothing occurred during the twelve-month period thereafter* (which is the default non-compete period) to trigger the application of the twenty-four month period.

Wedgworth's resignation, with or "without Good Reason," was tendered on March 16, 2007, a full four months after the non-compete provision had already expired according to its terms.[3]

Notwithstanding this plain reading of the contract, Plaintiff insists that the parenthetical in Paragraph 11(b) refers only to Wedgworth's actual *employment* (rather than his employment under the contract). Relying upon this interpretation, Plaintiff asserts that because Wedgworth remained employed after Plaintiff terminated his employment contract (and even after the twelve-month period had expired), an event triggering the application of the twenty-four month period could occur after

_____

[3]Alternatively, even if the court were to accept Plaintiff's argument and find that the twenty-four month period applied (which it expressly does not), the court would conclude that Wedgworth could have, in fact, terminated his employment with "Good Reason." Although Wedgworth explicitly gave "health-related issues" and "stress" as explanations for his resignation, which are clearly not enumerated in the Second Agreement's definition of "Good Reason," the court is inclined to find that he had "Good Reason" to resign under Paragraphs 8(a)(ii) and (v), which state:

"For the purposes of this Agreement "<u>Good Reason</u>" shall mean:

. . .

(ii)    the failure to continue Executive in his position as provided in Paragraph 1 or removal of him from such position, in each case during the Employment Term;

. . .

(v)    Employer's failure to fulfill the other terms of this Agreement."

(Doc. # 2 Ex. C ¶¶ 8(a)(ii) & (v)). For example, Plaintiff's termination of the Second Agreement arguably failed "to continue [Wedgworth] in his position as provided in Paragraph 1," since that paragraph defines the "Employment Term" in part as the term during which the Second Agreement is effective. With the termination of the Second Agreement, Wedgworth was no longer employed as provided in paragraph one, *i.e.*, under the terms of the Second Agreement (with the exception of those surviving provisions described *supra*), and thus he had "Good Reason" to terminate his employment. The same could be said of Paragraph 8(a)(v)—as there was no longer any "Agreement," it follows as a matter of law and logic that Plaintiff could not have continued to fulfill its "other terms." However, because there are alternative reasons to deny Plaintiff the relief it seeks, the court notes, but does not fully analyze, this rationale.

the twelve-month non-compete period expired, but before the end of his employment.  The court rejects that convoluted reading of the contract.  Once the twelve-month period had elapsed, and there was no triggering event during that time, that provision of the contract expired.[4]  To hold otherwise would create a twelve-month period (from the expiration of the twelve-month period, December 16, 2006, until the expiration of the twenty-four month period, December 16, 2007) during which the longer extension could be retroactively triggered.  Such a construction would (1) lead to the mischief of the parties having rights and obligations under the contract that were at best ill-defined and (2) place Wedgworth in contractual and legal limbo with respect to his employment.

Therefore, the non-compete provision, specifically Paragraph 11(b) of the Second Agreement, expired by its terms on December 16, 2006.  Any agreement the parties had on this point no longer exists between them, and Plaintiff cannot show a likelihood of success on the merits of this argument.  Therefore, the court cannot issue a preliminary injunction ordering Plaintiff not to compete under the terms of this provision.

### Plaintiff's Claims Regarding Non-Solicitation[5]

Paragraph 11(d) of the Second Agreement provides:

---

[4]Plaintiff's appeal to the survivability provision in Paragraph 22 of the Second Agreement is futile, as that paragraph simply recites that Wedgworth's "obligations under the provisions of Paragraphs 10, 11, and 12 . . . shall survive the termination or expiration of this Agreement," without providing any alternate extension or survivability period; therefore, the court considers this as the parties undoubtedly intended—as a recital that the extensions in those particular paragraphs would still be applicable after the termination of the Second Agreement.

[5]As previously stated, the parties have asked the court to enter an agreed order prohibiting Wedgworth's solicitation of Plaintiff's employees, as prohibited by Paragraph 11(c) of the Second Agreement, so the court will discuss only Paragraph 11(d) entitled "Nonsolicitation of Customers" in this section.

> (d)    Non Solicitation of Customers.    Executive agrees that during the
> Non-Solicitation Period, he will not directly or indirectly, solicit or do business with,
> or be a Participant in any entity that solicits or does business with, any customer of
> Employer or any of its subsidiaries or affiliates, nor shall Executive in any way
> induce or attempt to induce any customer of Employer or any of its subsidiaries or
> affiliates to do business with any person or entity other than Employer or its
> subsidiaries or affiliates . . . .  Notwithstanding the foregoing, after the expiration of
> the noncompetition period set forth in Paragraph 11(b), Executive may participate as
> an investor in, an officer, employee, director or agent of or consultant for an entity
> that does business with one or more customers of Employer in competition with
> Employer or any of its subsidiaries or affiliates so long as Executive has no contact
> with such customer and has no direct or indirect involvement in the solicitation of
> competitive business from any such customer.

(Doc. # 2 Ex. C ¶ 11(d)).  "Participant" is defined by Paragraph 11(b) to include "employee," such

that the parties agree that if this paragraph operates to prevent Wedgworth from being employed by

Country Select, it would apply to him as a "Participant."  (Tr. 77–78).

The parties agree that nowhere does Paragraph 11(d) specifically mention "suppliers," such

that Plaintiff's chief concern—that Wedgworth is actively soliciting Plaintiff's suppliers on behalf

of Country Select—is not explicitly covered by that provision.  (Tr. 79).  Plaintiff argues that even

if Paragraph 11(b)'s express non-compete language is inapplicable, Paragraph 11(d) still operates to

prevent him from competing with Plaintiff since this provision forbids him from being a "Participant

in any entity that solicits or does business with[] any customer of Employer or any of its subsidiaries

or affiliates," and Paragraph 11(d) has the additional feature of being unambiguously applicable for

three years after the termination or expiration of the Second Agreement.  (Doc. # 2 Ex. C ¶ 11(d)).

Defendant argues that, read in this way, this provision would effectively render Paragraph 11(b)

meaningless and thus such a construction violates the rule that clauses in the same document be read

*in pari materia*.  Furthermore, Defendant argues that the plain meaning of the last sentence of

Paragraph 11(d) forecloses Plaintiff's interpretation of this clause.  Again, the court agrees with

Defendant and finds that the last line of the sub-paragraph unambiguously demonstrates the parties' intention that Paragraph 11(d) should not function as an additional non-compete clause.

Alabama law provides that contracts "are construed so as to give effect to the intention of the parties, and, to determine th[e] intent, a court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions." *Attorneys Ins. Mut. of Ala. v. Smith, Blocker and Lowther, P.C.*, 703 So. 2d 866, 870 (Ala. 1996). Reading the last sentence of Paragraph 11(d) in conjunction with the court's previous interpretation of Paragraph 11(b)'s noncompetition provision, it is clear that after Paragraph 11(b) expires, Wedgworth may be a "Participant" in a competitor of Plaintiff, so long as he "has no contact with *such customer* [*i.e.*, 'any customer of Employer or any of its subsidiaries or affiliates,' as stated previously in the same paragraph] and has no direct or indirect involvement in the solicitation of competitive business *from any such customer*." (Doc. # 2 Ex. C ¶ 11(d) (emphasis added)). Wedgworth is a catfish buyer who has only negotiated with his employers' *suppliers* (and this has been the case whether he was providing services to Country Select (at present) or Southern Pride (in the past)). Further, the parties agree that Wedgworth presently has no contact with any customers of any kind, whether or not they are or were customers of American Seafoods or Southern Pride; therefore, the "so long as" qualifying provision previously highlighted does not apply to him. (Tr. 76–77). As the court has determined that the non-compete provision, Paragraph 11(b), has expired under the terms of the Second Agreement, the court must also conclude that any part of the "Nonsolicitation of Customers" provision, Paragraph 11(d), that could be interpreted to prevent Wedgworth from competing as a "Participant" (*i.e.*, employee) of an entity that solicits Plaintiff's customers has expired as well. Stated differently, the last sentence of Paragraph 11(d) governs this case because the non-compete provision has expired, and

15

Wedgworth "may participate" as an employee in County Select (which is an entity that solicits Plaintiff's customers and/or competes with Plaintiff). Just as with Paragraph 11(b), Paragraph 11(d) does not operate to restrict Wedgworth's solicitation of Plaintiff's suppliers or any other of his actions complained of by Plaintiff. There being no valid contractual provision on this issue between the parties, the court again finds that Plaintiff cannot show a substantial likelihood of its success on the merits of this breach of contract claim, and thus the court cannot enter a preliminary order enjoining these activities.[6]

---

[6]The court's primary conclusion is that Paragraph 11(d) does not restrict Defendant's activities of which Plaintiff complains because the non-compete provision of Paragraph 11(b) has expired, and, therefore, so has any part of Paragraph 11(d) that could be construed as a non-compete provision because of the last sentence of that section. During the evidentiary hearing, Plaintiff urged the court to consider several other theories as to why this was not the case, why Paragraph 11(d) should apply anyway, or why Paragraph 11(d)'s broader non-solicitation provisions (which undoubtedly operate for thirty-six months past the termination of the Second Agreement, or until December 16, 2008) should be interpreted to prohibit Wedgworth's solicitation of "suppliers" as well as customers. The court need not, and will not, recount all of the reasons that it declined to accept these arguments during the hearing, but rather simply refers to the portions of the hearing transcript addressing these issues. (Tr. 77–97).

However, the court will note here that, at base, it seems Plaintiff urges the court to conclude, in one manner or another, that the parties intended Paragraph 11(d) to apply to the solicitation of suppliers as well as customers. Aside from the word's conspicuous absence from the text of the provision, the court would find that argument undermined by Defendant's evidentiary submission of the "Employment Separation Agreement," dated March 16, 2007, presented to Wedgworth by Plaintiff (specifically, by Bleth), which explicitly seeks to *expand* the coverage of Paragraph 11(d) of the Second Agreement by adding that "Wedgworth' [sic] non-solicitation obligations set forth in Section 11(d) shall extend to *suppliers of the Company as well as customers*." (Doc. # 7 Ex. A ¶ 4.2 (emphasis added)). If, as Plaintiff contends, Paragraph 11(b) was meant to cover Wedgworth's solicitation of Plaintiff's suppliers all along, this language would be superfluous. Furthermore, the fact that such explicit language relating to the solicitation of suppliers is found in the First Agreement as well as the "Employment Separation Agreement" is evidence that Plaintiff and/or its subsidiaries and legal predecessor knew how to include such a provision in an employment agreement and expressly chose not to do so in the Second Agreement at issue in this case.

Finally, the court would note that broadly construing Paragraph 11(d) as a non-compete provision would raise serious concerns for the court as to its validity considering Alabama's policy

**Plaintiff's Claims Regarding Non-Disparagement and Non-Disclosure**

Finally, Plaintiff seeks to enjoin Defendant from disparaging Plaintiff or its subsidiaries and from disclosing or using any confidential information of Plaintiff in his dealings with Plaintiff's competitors or other entities.  Again, Plaintiff would base these injunctions on a breach of contract theory, citing specific contractual provisions in the Second Agreement,[7] and noting that these

---

that covenants not to compete be strictly interpreted because they are disfavored, and that such provisions be narrowly tailored in scope, duration, and geographical coverage. *See Nationwide Mut. Ins. Co. v. Cornutt*, 907 F.2d 1085, 1087–88 (11th Cir. 1990); *T.G.I. Friday's v. Int'l Restaurant Group, Inc.*, 569 F.2d 895, 900 (5th Cir. 1978).  (In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.)  *See also Pitney Bowes, Inc. v. Berney Office Solutions*, 823 So.2d 659, 666 (Ala. 2001); *Constr. Materials Ltd., Inc. v. Kirkpatrick Concrete, Inc.*, 631 So.2d1006, 1009 (Ala. 1994).  Nor does Plaintiff's argument that the provision is actually a non-solicitation provision, which Alabama courts have considered to be only partial restraints of trade and thus not within the purview of the statute limiting non-compete covenants and the policy concerns surrounding it, *Hoppe v. Preferred Risk Mut. Ins. Co.*, 470 So.2d 1161, 1164 (Ala. 1985), quell the court's concerns.  Here, Plaintiff quite plainly seeks to apply the provision effectively as a *de facto* non-compete provision.  *See Digitel Corp. v. Deltacom, Inc.*, 953 F. Supp. 1486, 1495 (M.D. Ala. 1996) ("To determine, however, whether the non-solicitation agreement should be enforced, the court must examine 'the facts of the particular case' and make a determination 'as to whether the restriction upon one person is greater than necessary for the reasonable protection of a substantial interest of the other party.'") (citing *Affiliated Paper Companies, Inc. v. Hughes*, 667 F. Supp. 1436, 1447 (N.D. Ala. 1987)); *see also Corson v. Universal Door Sys., Inc.*, 596 So.2d 565 (Ala. 1991) (noting in its discussion that generally, Alabama courts will find broader restrictions as to time, place, and customer base to be reasonable for non-solicitation provisions than for non-compete clauses, *if* there remains a sufficient customer/supplier base in the industry such that the non-solicitation provision does not effectively become a non-compete clause).

[7]Specifically, the non-disclosure/confidentiality provision is set forth Part II. "Statement of Facts," *supra*, and is Paragraph 10(b) of the Second Agreement.  The non-disparagement provision is found at Paragraph 12 of the Second Agreement, and states, in relevant part:

> Nondisparagement.  Executive will not, at any time during or after this Agreement directly (or through any other person or entity) make any public or private statements (whether oral or in writing) which are derogatory or damaging to Employer or any of its subsidiaries, affiliates, businesses, activities, operations, affairs, reputations or prospects, or any of their respective officers, employees, directors or shareholders,

provisions, both by their specific terms and through the survivability clause of Paragraph 22, bind Defendant past the expiration or termination of the contract.  Because the court finds that Plaintiff has failed to present substantial evidence of both Defendant's disparagement of American Seafoods and/or Southern Pride and his disclosure and use of confidential information, the court concludes that Plaintiff cannot show that there is a substantial likelihood that it would succeed on the merits of this claim.  Thus, the court declines to enter an injunction regarding these claims also.

The disparaging remarks relied upon by Plaintiff to show Defendant's breach of the non-disparagement provision surfaced in the evidentiary hearing through Defendant's own testimony, as Plaintiff failed to present any non-hearsay evidence on this issue.[8]  Specifically, Wedgworth admits to making statements that he "was worried about the company [Southern Pride]," particularly with regard to some financial information.  (Tr. 16–18).  However, Wedgworth explained, under oath, that none of these statements specifically referenced any financial information that he was privileged to as a member of Southern Pride's senior management and that most of them referenced information disclosed at a public meeting with catfish farmers/suppliers of Southern Pride.  (*Id.*).  Additionally, Plaintiff's own witness, Terry Goldsby (who replaced Wedgworth as the Director of Live and Harvest Operations at Southern Pride after he resigned)  testified that at some point last month (and it is unclear if this is the same public meeting referenced by Defendant), there was a public, industry-wide meeting during which Southern Pride's importation of catfish from China was discussed, and

---

except in response to a subpoena, court order, or other legal compulsion.

(Doc. # 2 Ex. C ¶ 12).

[8]Plaintiff did, however, present hearsay evidence through the Affidavit of Terry Goldsby (Doc. # 2 Ex. F ¶¶ 12–14) and Mr. Goldsby's hearsay testimony at the evidentiary hearing (Tr. 31–33).

it was clear that several catfish farmers do not approve of this practice. (*Id.* at 41–43). Goldsby further testified that the information disclosed at the meeting and the fact that Southern Pride continued to import fish angered some farmers/suppliers, and that this may have been one reason that some of them discontinued selling to Southern Pride. (*Id.*). Considering the evidence as a whole, Plaintiff has failed to point to any particular action by Wedgworth that would rise to the level of disparagement, and has also failed to substantiate its claim with reliable evidence. Moreover, the evidence presented to the court suggests that there are reasons other than Defendant's alleged disparagement that could have affected Plaintiff's fish supply. Keeping in mind that a preliminary injunction is a "drastic remedy,"[9] and further considering that an injunction against speech may in certain situations flirt with violating the First Amendment,[10] the court concludes that Plaintiff has failed to put forth evidence sufficient to show its substantial likelihood of success on the merits of its disparagement claim; accordingly, this court should not grant an injunction on this issue.

Finally, Plaintiff contends that Defendant has breached the non-disclosure provision of the Second Agreement by either disclosing confidential information that he gained during his time in Plaintiff's employment or by using such information to solicit suppliers for Country Select, thus competing with Southern Pride.[11] Specifically, Plaintiff asserts that Wedgworth has used the pricing or specific financial information regarding Southern Pride that he gained as a member of its senior

---

[9]*Crochet v. Housing Authority of City of Tampa*, 37 F.3d 607, 610 (11th Cir. 1994) (internal citations omitted).

[10]*See generally Doe v. Gonzales*, 126 S. Ct. 1 (2005); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261 (11th Cir. 2006).

[11]To the extent that Plaintiff again raises the argument premised upon the non-compete or non-solicitation provisions, the court would direct the reader to the court's discussion of those matters, *supra*.

management team, and that he established the relationships with suppliers that he is now exploiting in favor of Country Select while employed with Southern Pride.  (Tr. 50, 86, 93–93, 96; Doc. # 2). However, during the evidentiary hearing, the following facts were established (at least for the purpose of the instant motion):  (1) catfish are a fungible commodity (Tr. 38); (2) catfish pricing is set by market rate, typically in "price bands," which have an upper and lower limit for the fish, and these price bands are well known to all in the industry (Tr. 16, 34–36, 38–39); (3) Southern Pride followed this market/band pricing scheme when buying fish (Tr. 34–36, 38–39); (4) relationships between a processor and supplier are paramount when buying catfish to process, as the catfish farmers/suppliers must have a good relationship with that processor to sell to them (Tr. 16, 28–30, 35–36, 39); (5) Wedgworth was employed by Southern Pride under American Seafoods for four years (since it was another legal entity, SPCC, before that time), and gained most of his experience and made most of his contacts during the preceding sixteen years with another company (SPCC) and his seven years as an independent catfish broker (Tr. 19); (6) Wedgworth admits that he did gain some additional experience/forge some additional relationships in his time with Southern Pride (Tr. 19); and, (7) Wedgworth, the only witness to present non-hearsay testimony on this issue, admits to using relationships that he had established at some point in his career in order to solicit suppliers for Country Select, but not any of Southern Pride's confidential information (Tr. 16–18).  Based upon this evidence, which, again, was the only non-hearsay evidence presented to the court,[12] the court cannot conclude that Wedgworth in fact disclosed, used, or is using the Plaintiff's confidential information in violation of Paragraph 10(b) (the non-disclosure provision) instead of his own

---

[12]Again, Plaintiff did present hearsay evidence through the Affidavit of Terry Goldsby (Doc. # 2 Ex. F ¶ 19), and attempted to do so during the evidentiary hearing as well (Tr. 31–33).

knowledge or experience in soliciting suppliers for Country Select.  More importantly, the court finds that Plaintiff cannot present adequate evidence on this issue so as to show that it is substantially likely to succeed on the merits of this claim at trial.  Thus, an injunction cannot issue.

## V.    Conclusion

For the reasons explained above, Plaintiff's Motion for Preliminary Injunction (Doc. # 2) is due to be denied.  The court will enter an order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this _____16th_____ day of April, 2007.

                                        **R. DAVID PROCTOR**
                                        UNITED STATES DISTRICT JUDGE

21